The **TORRINGTON COMPANY, Plaintiff and Defendant–Intervenor,**

v.

The **UNITED STATES, Defendant,**

**NMB Thai Ltd., Pelmec Thai Ltd., NMB Hi–Tech Bearings Ltd. and NMB Corporation, Defendants–Intervenors and Plaintiffs.**

Slip Op. 97–81.
Court No. 95–03–00353.

United States Court of International Trade.

June 23, 1997.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, Amy S. Dwyer, Olufemi Areola, Geert De Prest, Patrick J. McDonough and Timothy C. Brightbill), Washington, DC, for The Torrington Company.

White & Case (Walter J. Spak, William J. Clinton and David E. Bond), Washington, DC, for NMB Thai Ltd., Pelmec Thai Ltd., NMB Hi–Tech Bearings Ltd. and NMB Corporation.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Meln-

brencis); of counsel: Mark A. Barnett, Washington, DC, Michelle K. Behaylo, Grand Rapids, MI, Stacy J. Ettinger, Thomas H. Fine, Dean A. Pinkert, and David J. Ross, Attorney–Advisors, Washington, DC, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

### OPINION

TSOUCALAS, Senior Judge.

Plaintiff and defendant-intervenor The Torrington Company ("Torrington") moves this Court pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging aspects of the final determination of the Department of Commerce, International Trade Administration ("Commerce"), of the fourth administrative review of antifriction bearings ("AFBs") from Thailand, entitled *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders ("Final Results"),* 60 Fed.Reg. 10,900 (1995). Defendant-intervenors and plaintiffs NMB Thai Ltd., Pelmec Thai Ltd., NMB Hi–Tech Bearings Ltd. and NMS Corporation (collectively "NMB") oppose Torrington's motion and also challenge Commerce's fourth administrative review of AFBs from Thailand.

### Background

On May 15, 1989, Commerce published the antidumping duty orders on AFBs from Thailand. *See Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand,* 54 Fed.Reg. 20,909 (1989). The fourth administrative review encompasses imports of AFBs entered during the period of May 1, 1992 through April 30, 1993. The present consolidated action concerns imports from Thailand.

On February 28, 1994, Commerce published the preliminary results of the fourth administrative review. *See Antifriction Bearings (Other Than Tapered Roller Bearings)* *and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, Thailand, and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Notice of Intent To Revoke Orders (in Part),* 59 Fed.Reg. 9,463 (1994). On February 28, 1995, Commerce published the Final Results at issue. *See Final Results,* 60 Fed.Reg. at 10,900.

Torrington contests the following actions of Commerce: (1) calculation of profit based upon class or kind of merchandise or statutory minimum rather than upon reported sample sales of such or similar merchandise; (2) inclusion of Route B sales in home market database; (3) adjustment to foreign market value ("FMV") for freight expenses for Route B sales; (4) acceptance of billing adjustments on U.S. and home market sales; (5) acceptance of reported early payment discounts; and (6) acceptance of reported ocean and air freight costs.

NMB claims that Commerce erred by: (1) including research and development ("R & D") expenses related to non-subject merchandise in calculating cost of production and constructed value and failing to allocate R & D expenses of Minebea Co., Ltd. ("Minebea Japan") over the total consolidated cost of its sales; and (2) adding packing expenses to FMV twice.

On May 3, 1995, the Court granted Torrington's motion for a preliminary injunction enjoining the liquidation of the subject entries for the duration of this litigation.

### Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459,

95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

1. *Calculation of Profit*

■ In the Final Results at issue, Commerce calculated profit for constructed value on the basis of class or kind of merchandise. If the profit amount was less than the statutory minimum of eight percent, Commerce used the statutory minimum. *Final Results*, 60 Fed.Reg. at 10,923. Torrington contends that Commerce erred by not relying on reported sample sales of such or similar merchandise. According to Torrington, Commerce should have presumed that profit based on sales of such or similar merchandise, as reported by respondents, would be representative of the profit for the general class or kind of merchandise. Torrington's Mem. Supp. Mot. J. Agency R. at 21–24.

The Court has previously addressed and rejected Torrington's argument pertaining to this issue. In *Federal–Mogul Corp. v. United States*, 20 CIT at ——, ——, 918 F.Supp. 386, 403–04 (1996), the Court held that while Commerce has the authority to select appropriate samples for determining U.S. price and FMV pursuant to 19 U.S.C. § 1677f–1 (1988),[1] Commerce also has the discretion not to use samples at all. *See also Torrington Co. v. United States*, 21 CIT ——, ——, 960 F.Supp. 339, 343–44 (1997); *INA Walzlager Schaeffler KG v. United States*, 21 CIT ——, ——, 957 F.Supp. 251, 270–71 (1997). In accordance with prior decisions of this Court, Commerce is sustained on this issue.

2. *Inclusion of Route B Sales in Home Market Database*

■ Torrington contests Commerce's decision to include NMB's Route B sales in the home market database. Torrington argues that NMB failed to establish that its Route B sales were in the ordinary course of trade as defined by 19 U.S.C. § 1677(15) (1988). Torrington maintains that Commerce's conclusion that the sales were in the ordinary course of trade is inconsistent with Commerce's determinations in the original investigation and other cases. Torrington's Mem. Supp. Mot. J. Agency R. at 26–31. Torrington further asserts that NMB did not demonstrate that its Route B sales consisted of ball bearings produced in Thailand subject to this investigation. *Id.* at 31–32.

Commerce responds that it properly classified NMB's Route B sales as home market sales once it determined that the first sales to unrelated parties occurred in Thailand. Commerce also insists that the sales are in the ordinary course of trade even though the trade route of Route B sales differs from that of Route A sales. Commerce explains that because NMB is subject to government restrictions on sales in Thailand, it was reasonable for NMB to devise a method to circumvent the restrictions in order to increase sales in the home market. Def.'s Partial Opp'n to Mots. J. Agency R. at 13–14.

Commerce further argues that Torrington failed to exhaust its administrative remedies regarding its contention that NMB did not demonstrate that its Route B sales are produced in Thailand. In the alternative, Commerce insists it verified that Route B ball bearings were indeed produced in Thailand. *Id.* at 14–16.

NMB agrees with Commerce's treatment of its Route B sales. NMB argues that the types of sales that fall within the definition of sales in the ordinary course of trade vary from one country to another. NMB explains that the AFBs are shipped out of Thailand prior to the sale of the merchandise because the Thai customs authority restricts direct shipments from a bonded facility to a customer with Board of Investment status.[2]

---

**1.** 19 U.S.C. § 1677f–1(b) states:

The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and

averages shall be representative of the transactions under investigation.

**2.** The Board of Investment of the Thai government offers certain incentives, such as import

NMB's Opp'n to Mot. J. Agency R. at 8–9. NMB further contends that, in contrast to the Route B sales involved in the original investigation, none of the Route B sales in this review were made to unrelated parties in Singapore. *Id.* at 10–11.

Torrington raised this same issue in a challenge to the third administrative review. *See Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 416–18. After remanding this issue to Commerce to explain its reasons for treating Route B sales as home market sales, the Court upheld Commerce's decision after determining that NMB's Route B sales never entered the commerce of Singapore. *Federal–Mogul Corp. v. United States,* 20 CIT ——, ——, 950 F.Supp. 1179, 1184 (1996), *appeals docketed,* No. 97–1253 (Fed.Cir. Feb. 27, 1997), No. 97–1321 (Fed.Cir. Apr. 18, 1997). The facts of this case are identical to those of the third administrative review. Therefore, the Court adheres to its prior decision and upholds Commerce's decision to treat NMB's Route B sales as home market sales.

### 3. *Adjustment for Freight Expenses of Route B Sales*

In the Final Results, Commerce treated NMB's post-sale home market freight expenses as direct selling expenses and its pre-sale home market freight expenses as indirect selling expenses. 60 Fed. Reg. at 10,942. Torrington contends that even if the Court upholds Commerce's decision to include NMB's Route B sales in the home market sales database, the Court should find that Commerce erred by not rejecting all adjustments for freight expenses incurred for transporting Route B sales from Thailand to Singapore and back to Thailand. According to Torrington, such expenses were not related to sales of bearings in Thailand but, rather, were general expenses incurred

for the purpose of receiving government benefits. Torrington's Mem. Supp. Mot. J. Agency R. at 33–34.

In rebuttal, Commerce claims that there is no factual or legal basis for denying the adjustments for expenses actually incurred even if such expenses were incurred to avoid value-added taxes and import duties. Def.'s Partial Opp'n to Mots. J. Agency R. at 18. NMB essentially agrees with the position taken by Commerce. NMB's Opp'n to Mot. J. Agency R. at 11–12.

In *Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 418, the Court affirmed Commerce's decision to adjust FMV for freight expenses associated with Route B sales. In the case at bar, however, Torrington raises some new arguments that need to be addressed. The crux of Torrington's argument is that the freight expenses are not "selling" expenses and, therefore, may not be deducted from FMV. The United States Court of Appeals for the Federal Circuit ("CAFC") in *Torrington Co. v. United States,* 68 F.3d 1347, 1356 (Fed.Cir.1995), held that Commerce may deduct indirect home market transportation expenses from FMV pursuant to the exporter's sales price ("ESP") offset cap. *See also Torrington Co. v. United States,* 82 F.3d 1039, 1047 (Fed.Cir.1996). The Court determined above that NMB's Route B sales were properly classified as home market sales. Therefore, because the freight expenses at issue were incurred as a result of these home market sales, Commerce properly deducted the expenses from FMV pursuant to the ESP offset cap.

### 4. *Billing Adjustments*

Torrington contests Commerce's acceptance of NMB's reporting of various billing adjustments on U.S. and home market sales. Torrington alleges that the billing

duty and corporate income tax exemptions to certain foreign investors. As a result, many Thai original equipment manufacturers are subsidiaries of foreign companies that have been granted exemptions by the Board of Investment. In addition, the Thai customs authority has granted NMB status as a bonded factory, meaning NMB imports raw materials free of import duties and taxes. Thai law requires approval of the Thai customs authority for direct sales from a bonded

factory to a customer with Board of Investment privileges. NMB claims the approval process is extremely time consuming and, therefore, in order to sell to customers in Thailand with Board of Investment status, NMB factories must ship their merchandise out of Thailand prior to selling the merchandise to most original equipment manufacturers in Thailand. NMB's Opp'n to Mot. J. Agency R. at 8–9.

adjustments reported do not accurately reflect U.S. and home market sales because a variety of the adjustments may have been made as much as five years or more after the sales under review. Torrington stresses that because verification did not occur until December 1993 and January 1994, Commerce could have verified whether additional billing adjustments were made after June 1993.[3] According to Torrington, Commerce had an obligation to investigate whether the submitted prices should have been relied upon in light of the fact that NMB's reported sales prices may be subject to change for a period of five years or more after the period under review. Torrington's Mem. Supp. Mot. J. Agency R. at 36–37.

Torrington further argues that Commerce's treatment of NMB's billing adjustments was inconsistent with its treatment of other post-sale price adjustments ("PSPAs"). Torrington explains that while Commerce generally requires PSPAs to be tied directly to the sales under consideration, in this instance, Commerce relied on prices based on billing adjustments that may have occurred up to five years after the original sales. To avoid the use of strategies intended to reduce antidumping duty liability, Torrington asserts that Commerce should have at least disallowed favorable adjustments to U.S. and home market prices. *Id.* at 38–39

Commerce counters that it properly allowed NMB's billing adjustments because NMB submitted a complete and accurate response to Commerce's request for information. Commerce emphasizes that the data NMB provided was as up-to-date as possible given the deadline for questionnaire responses. Def.'s Partial Opp'n to Mots. J. Agency R. at 20–21. Commerce further argues that it was unlikely that any significant quantity of billing adjustments relating to sales during the period of review occurred after the period covered by the response, and that any possible additional adjustments could serve either to decrease or increase the margins. *Id.* at 21–22.

Defendant-intervenor and plaintiff NMB asserts that, in accordance with Commerce's instructions, it reported billing adjustments on a transaction-specific basis. NMB insists that Commerce's thorough on-site verification revealed only one minor discrepancy. NMB further maintains that billing adjustments by definition occur after sales are made and, therefore, should be considered part of the original sales transactions regardless of when they are made. NMB's Opp'n to Mot. J. Agency R. at 13–15.

The Court recently addressed this issue with regard to the imports of NMB/Pelmec Singapore during the fourth administrative review period. The Court upheld Commerce's acceptance of NMB's billing adjustments as being supported by both the record and law. *Torrington Co. v. United States,* 21 CIT ——, ——, 965 F.Supp. 40, 43–44 (1997). The Court found that Torrington's position would create an undue burden on Commerce with minimal contribution to the accuracy of computing dumping margins. *Id.* Again, a review of the record indicates that the number of instances in which billing adjustments occurred more than three years after the original sales was minimal. *See Response of NMB to Supplemental Questionnaire,* P.R. Doc. No. 38, at Attach. 3, Torrington's App. As the facts of this case are almost identical to those in the prior decision involving NMB/Pelmec Singapore, the Court adheres to its holding and sustains Commerce on this issue.

### 5. *Early Payment Discounts*

In the Final Results, Commerce adjusted ESP for early payment discounts finding that NMB properly tied the discounts to particular sales. 60 Fed.Reg. at 10,930. Torrington challenges Commerce's acceptance of NMB's reporting methodology of early payment discounts which failed to exclude non-scope merchandise. According to Torrington, NMB failed to report the discounts on a transaction-specific basis even though NMB maintained adequate records to allow transaction-specific reporting. Torrington urges

---

**3.** NMB's questionnaire response indicates that it traced sales adjustments to original sales through the end of June 1993. *Response of NMB to*

*Supplemental Questionnaire,* P.R. Doc. No. 38, at 3–4, Torrington's App.

the Court to require Commerce to substitute best information available ("BIA") for NMB's reported discounts. Torrington's Mem. Supp. Mot. J. Agency R. at 40–42.

In response, Commerce claims it verified that NMB accurately reported and properly tied the discounts to particular invoices and to in-scope merchandise. Commerce argues that there is no record evidence to support Torrington's claim that NMB employed a methodology resulting in the allocation of early payment discounts to sales of scope and non-scope bearings. Def.'s Partial Opp'n to Mots. J. Agency R. at 22–24.

NMB explains that it granted early payment discounts to two customers who purchased in-scope and out-of-scope merchandise. According to NMB, the percentage of invoice value used to determine the amount of the early payment discount was identical for both in-scope and out-of-scope merchandise. NMB states that because the discount was earned as a percentage of the invoice price, NMB allocated the amount of the total early payment discount over the total invoice value of the merchandise subject to the lump-sum payments of the customers and reported the discounts on a transaction-specific basis. NMB insists that its methodology was consistent with Commerce practice and with prior Court decisions. NMB's Opp'n to Mot. J. Agency R. at 16–17 (citing *NSK Ltd. v. United States*, 19 CIT ——, ——, 896 F.Supp. 1263, 1273 (1995), *rev'd on other grounds*, 115 F.3d 965 (Fed.Cir. 1997)).

Commerce makes adjustments to ESP for early payment discounts pursuant to 19 U.S.C. § 1677a. Such adjustments are made in order to arrive at an accurate price at which the merchandise at issue is sold in the United States. *See* 19 U.S.C. § 1677a(c). Unlike adjustments to FMV pursuant to the ESP offset provision, Commerce may make adjustments to ESP for both direct and indirect expenses. *See Torrington*, 82 F.3d at 1049.[4]

The Court agrees with Torrington to the extent that Commerce must be able to separate early payment discounts granted on in-scope merchandise from those granted on out-of-scope merchandise in order to make an accurate adjustment to ESP. Torrington's conclusion that Commerce was unable to make such a distinction, however, is incorrect. Torrington focuses on NMB's reporting methodology rather than Commerce's verification. In *NSK*, 896 F.Supp. at 1273, the Court stated the following in reference to discounts deductible from FMV:

> [D]iscounts paid on subject merchandise can be allocated over all sales of the merchandise as long as discounts paid only on the subject merchandise are used to calculate the per-unit amount of discounts to be deducted, and the discounts "can be directly correlated with specific merchandise using verified cost and sales information."

(Quoting *Smith–Corona Group v. United States*, 713 F.2d 1568, 1580 (Fed.Cir.1983)). While NMB was unable to report the discounts on an invoice-specific basis, Commerce was able to calculate discounts on a per-unit basis and directly correlate the discounts to specific merchandise through verified cost and sales information as evidenced by the following statements by Commerce in its verification report:

> Early payment discounts were applicable to two customers. . . . We were first shown the total discounts for the [period of review]. This was then broken down into product category. We looked at July 1992. There were two payments . . . covering several invoices. It was explained that the customer takes the invoice amount less the freight and applies the discount percentage. We examined the invoices and matched these to the payment voucher listing. The difference between the invoice amount and the payment corresponded to the discount reported. The discount was

---

4. In *Torrington*, 82 F.3d at 1050–51, the CAFC held that Commerce must rely on the calculation of PSPAs rather than the allocation of such adjustments in determining whether such expenses are direct expenses and, therefore, properly deducted from FMV pursuant to the ESP offset regulation. While the CAFC shifted the analysis from this Court's focus on whether Commerce was able to separate expenses incurred for sales of in-scope merchandise from those incurred for out-of-scope merchandise for the purpose of determining the proper adjustment to FMV, the CAFC did not alter the analysis for adjustments to ESP.

divided between M & I and Pelmec based on invoiced sales amount. We repeated this process for the other customer.... We found no discrepancies.

*NMB Thailand & NMB Singapore U.S. Sales Verification Report,* P.R. Doc. No. 41, at 9–10, Torrington's App. Since the percentage used to calculate the discount amount was the same for both in-scope and out-of-scope merchandise, Commerce was able to tie the relevant discounts to in-scope merchandise. Accordingly, the Court finds Commerce's actions to be consistent with law and supported by the administrative record.

### 6. *Air and Ocean Freight Expenses*

██ Torrington contends that Commerce erred in accepting NMB's reported air and ocean freight expenses on a commingled basis. According to Torrington, NMB failed to comply with questionnaire instructions to report air and ocean freight expenses on "a per unit and transaction-by-transaction basis." Torrington's Mem. Supp. Mot. J. Agency R. at 43.

Torrington also points out that NMB did not separate air freight expenses from ocean freight expenses on a customer-specific basis in spite of a request from Commerce to do so in a deficiency letter. Torrington challenges NMB's claim and Commerce's final determination that NMB could not link each shipment to individual U.S. sales. Torrington argues that Commerce's verification of NMB's response revealed that sales could be linked to shipments and, therefore, Commerce's acceptance of NMB's reporting methodology was not supported by the record. Torrington requests a remand requiring Commerce to resort to BIA. *Id.* at 44–46.

Commerce counters that it properly accepted NMB's reported air and ocean freight expenses once it recognized that in ESP transactions, there is often no direct link between specific shipments and individual sales. Commerce maintains that none of the documents cited by Torrington establishes a direct link between a specific shipment and an individual sale. Commerce concludes that because it determined NMB's methodology was reasonable and representative, resorting to BIA would not have been appropriate.

Def.'s Partial Opp'n to Mots. J. Agency R. at 25–27. NMB essentially agrees with the arguments advanced by Commerce. NMB's Opp'n to Mot. J. Agency R. at 19–20.

The Court recently addressed this precise issue in reference to NMB/Pelmec Singapore in *Torrington,* 965 F.Supp. at 44–46. The Court upheld Commerce's acceptance of NMB's reporting of air and ocean freight expenses, finding that Commerce properly determined that it could not link specific sales to specific shipments. *Id.* at 45–46. The Court further held that Commerce satisfied its duty to investigate the methodology proposed by NMB to determine whether it was "reasonable and representative." *Id.* at 46 (quoting *Torrington Co. v. United States,* 17 CIT 967, 972, 832 F.Supp. 405, 410 (1993)). As the facts of this case are identical to those regarding NMB/Pelmec Singapore, the Court adheres to its prior decision and sustains Commerce on this issue.

### 7. *NMB's Research and Development Expenses*

██ NMB contends that Commerce erred by including R & D expenses directly related to non-subject merchandise in its calculations of cost of production and constructed value. NMB emphasizes that, pursuant to the antidumping statute and governing regulations, Commerce may only include in cost of production and constructed value manufacturing costs and general expenses relating to the class or kind of merchandise subject to the antidumping duty order. NMB maintains that because record evidence demonstrated that the R & D expenses incurred by Minebea Japan related directly to non-subject merchandise, Commerce's addition of these expenses to NMB/Pelmec Thailand's cost of production and constructed value was inconsistent with law. NMB's Mem. Supp. Mot. J. Agency R. at 12–17.

In the alternative, NMB requests a remand for Commerce to allocate the expenses over Minebea Japan's total consolidated cost of sales rather than over only a small portion of Minebea Japan's operations. *Id.* at 18–19.

Commerce responds that NMB failed to provide Commerce with relevant information about the distribution of R & D expenses to

specific projects. Commerce further claims that NMB has failed to demonstrate to this Court that all of the R & D costs incurred by Minebea Japan were incurred with respect to non-subject merchandise. Def.'s Partial Opp'n to Mots. J. Agency R. at 38–40.

Commerce consents to a remand, however, to recalculate NMB/Pelmec's cost of production and constructed value after allocating Minebea Japan's R & D expenses over its total consolidated cost of sales, rather than over the subject merchandise. *Id.* at 40.

Torrington agrees with Commerce's conclusion that NMB failed to demonstrate that the R & D expenses were not related to the subject merchandise. Torrington objects to a remand, however, claiming that NMB failed to request a reallocation of the R & D expenses at the administrative level. Torrington's Opp'n to Mot. J. Agency R. at 5–14.

Again, NMB raises an issue recently addressed by this Court in *Torrington,* 965 F.Supp. at 46–47. The Court found that statements in Minebea Japan's annual report indicated that the R & D expenses may have been related to subject merchandise. *See 1992 Annual Report of Minebea Co., Ltd.,* at 11, NMB's App., Ex. 2. The Court further held that NMB failed to demonstrate that Minebea Japan's R & D expenses were limited to non-subject merchandise. *Torrington,* 965 F.Supp. at 47. The Court did remand the case, however, for Commerce to recalculate NMB's cost of production and constructed value after allocating Minebea Japan's R & D expenses over its total consolidated cost of sales. *Id.* at 47. The facts involved in this case are indistinguishable from those in *Torrington.* Therefore, this case is remanded to Commerce to allocate Minebea Japan's R & D expenses over its total consolidated cost of sales.

### 8. *Packing Expenses*

NMB contends that Commerce erred by adding NMB's packing expenses to FMV twice. NMB's Mem. Supp. Mot. J. Agency R. at 19–20. Commerce agrees that the final margin program for NMB/Pelmec Thai resulted in double-counting of packing expenses. Def.'s Partial Opp'n to Mot. J. Agency R. at 41. After a review of the

record, the Court agrees a remand is necessary to correct the clerical error resulting in the double-counting of packing expenses.

### *Conclusion*

In accordance with the foregoing opinion, this case is remanded to Commerce to: (1) recompute NMB's cost of production and constructed value after allocating Minebea Japan's R & D expenses over its total consolidated cost of sales; and (2) correct the clerical error resulting in the double-counting of NMB's packing expenses. Commerce is affirmed as to all other issues raised herein.

The remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date the responses or comments are due.

### *ORDER*

This Case having been duly submitted for a decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), to recalculate constructed value and cost of production of NMB Thai Ltd., Pelmec Thai Ltd., NMB Hi–Tech Bearings Ltd. and NMB Corporation (collectively "NMB") after allocating research and development costs of Minebea Co., Ltd. over total consolidated cost of sales; and it is further

**ORDERED** that Commerce correct the clerical error resulting in the double-counting of NMB's packing expenses; and it is further

**ORDERED** that Commerce is affirmed with respect to all other issues raised herein; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within

fifteen (15) days of the date the responses or comments are due.