THE TORRINGTON COMPANY,
Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee,

and

NMB Thai Ltd., Pelmec Thai Ltd., NMB Hi–Tech Bearings Ltd., and NMB Corporation, Defendants–Appellees.

No. 98–1126.

United States Court of Appeals, Federal Circuit.

Oct. 7, 1998.

James R. Cannon, Jr., Stewart and Stewart, Washington, DC, argued for plaintiff-appellant. On the brief were Terence P. Stewart and Geert De Prest. Of counsel were Wesley K. Caine and Lane S. Hurewitz.

Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, argued for defendant-appellee United States. With her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel for Import Administration, Berniece A. Browne, Senior Counsel, and Stacy J. Ettinger, Attorney–Advisor, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC.

Christopher F. Corr, White & Case, Washington, DC, argued for defendants-appellees NMB Thai Ltd., et al. With him on the brief were Walter J. Spak and Richard J. Burke. Of counsel were Christopher M. Curran, William J. Clinton, and Richard G. King.

Before MICHEL, Circuit Judge, ARCHER, Senior Circuit Judge, and PLAGER, Circuit Judge.

Opinion for the court filed by Circuit Judge MICHEL. Dissenting opinion filed by Senior Circuit Judge ARCHER.

MICHEL, Circuit Judge.

This appeal continues the enduring saga of the efforts of this American ball bearing manufacturer to obtain relief from certain foreign competitors under the trade laws. Here, The Torrington Company ("Torrington") appeals the judgment of the United States Court of International Trade upholding the final determination of the United States Department of Commerce ("Commerce") in its fourth administrative review of the importation of antifriction bearings from various countries. *See* Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, and Revocation in Part of Antidumping Duty Orders, 60 Fed.Reg. 10,900 (1995) (the "antidumping review"), *aff'd-in part* and *remanded-in-part, Torrington Co. v. United States,* 969 F.Supp. 1332 (CIT 1997); *see also Torrington Co. v. United States,* No. 95–03–00353, slip op. 97–140 (Ct. Int'l Trade Sept. 26, 1997) (dismissing the lawsuit after holding that Commerce had complied with the remand order by performing the necessary recomputations of value and the correction of a clerical error). Defendants–Appellees NMB Thai Ltd., Pelmec Thai Ltd., NMB Hi–Tech Bearings Ltd., and NMB Corp. (collectively, "NMB Thai") were interested party-respondents in the underlying antidumping administrative review and were defendants-intervenors at the Court of International Trade. In this appeal, Torrington contends only that the Court of International Trade erred by upholding the determination of Commerce to adjust the foreign (home) market value of the subject antifriction bearings to take account of certain international freight expenses. Because Commerce's decision to allow an adjustment for such freight expenses was based upon a reasonable interpretation of its own regulations and thus was entitled to deference, we affirm.

BACKGROUND

NMB Thai is a producer of antifriction ball bearings in Thailand. These bearings are both sold in Thailand and exported to the United States. The antidumping review encompassed importations of such bearings entered between May 1, 1992, and April 30, 1993. During this period, NMB Thai sold its ball bearings in the Thai market through two distinct channels. "Route A" sales were shipped directly to the customer in Thailand via a domestic route. "Route B" sales, however, were first shipped abroad to a warehouse operated by a related company in Singapore and then back to Thailand. The purpose of this circuitous Route B was to obtain certain favorable tax and duty treatment from the Thai government and, in particular, to avoid government restrictions on sales to Thai customers who were certified by the Thailand Board of Investment but did not have a bonded warehouse.

On May 15, 1989, Commerce published antidumping duty orders on antifriction bearings from Thailand. *See* Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand, 54 Fed.Reg. 20,909 (1989) (the "antidumping duty order"). The Commerce decision at issue in the Court of International Trade was rendered in the fourth administrative review of the antidumping duty order.

In the antidumping review, Commerce determined the "United States price" and the "foreign market value" ("FMV") of the subject merchandise and used this data to calculate antidumping margins in accordance with 19 U.S.C. § 1675. These margins were then used by Commerce to assess antidumping duties on the entries of merchandise covered by the review as well as to calculate estimates of antidumping duties for future entries. *See id.*

In determining FMV, Commerce is permitted to make adjustments for certain "circumstances of sale" ("COS") in accordance with 19 C.F.R. § 353.56.[1] Such COS adjust-

---

**1.** The statutory authority for this regulation comes from 19 U.S.C. § 1677b(a)(4) which provides, in relevant part:

In determining foreign market value, if it is established to the satisfaction of the adminis-

tering authority that the amount of any difference between the United States price and the

ments are made when the seller incurs certain costs in its home market sales that it does not incur when selling to the United States market. Such adjustments may be made if "the amount of any price differential is wholly or partly due to such difference [in circumstances of sale]" and "those circumstances ... bear a direct relationship to the sales compared." 19 C.F.R. § 353.56(a)(1). In addition, adjustments to FMV may also be made for indirect selling expenses "incurred in selling such or similar merchandise up to the amount of expenses ... incurred in selling the merchandise." 19 C.F.R. § 353.56(b)(2). In the antidumping review, Commerce deducted from FMV the pre-sale freight costs for shipping merchandise from Thailand to Singapore as indirect selling expenses pursuant to 19 C.F.R. § 353.56(b)(2). Commerce also deducted from FMV the post-sale freight expenses of shipping the merchandise from Singapore back to Thailand as direct selling costs pursuant to 19 C.F.R. § 353.56(a)(1).

Before the Court of International Trade, Torrington argued, *inter alia,* that NMB Thai's Route B freight expenses were not "selling expenses" for purposes of 19 C.F.R. § 353.56, but rather were general costs incurred for the purpose of receiving government benefits. The Court of International Trade, however, rejected this contention, explaining that this court had previously held both that the "Route B sales were properly classified as home market sales" and that "Commerce may deduct indirect home market transportation expenses from FMV [subject] to the exporter's sales price ... offset cap." *Torrington,* 969 F.Supp. at 1336 (citing *Torrington Co. v. United States,* 82 F.3d 1039, 1047 (Fed.Cir.1996) and *Torrington Co. v. United States,* 68 F.3d 1347, 1356 (Fed.Cir. 1995)).

On appeal to this court, Torrington argues that the plain meaning of the governing statute and regulation both indicate that the Route B freight expenses are not selling costs that may be accepted as downward

COS adjustments to FMV and, moreover, that permitting such adjustments would defeat the purpose of the COS provisions because the freight costs were offset by savings in NMB Thai's taxes and duties.

## DISCUSSION

Our analysis must begin with the controlling statutory language. Under 19 U.S.C. § 1677b(a)(4), "due allowance shall be made" for "the amount of any difference between the United States price and the foreign market value ... wholly or partly due to ... other differences in circumstances of sale." This court has previously explained that "the statute does not define the term 'circumstances of sale' nor does it prescribe any method for determining allowances. Congress has deferred to the Secretary's expertise in this matter." *Smith–Corona Group v. United States,* 713 F.2d 1568, 1575, 1 Fed. Cir. (T) 130, 137 (Fed.Cir.1983). Accordingly, under the authority of this statute, Commerce promulgated 19 C.F.R. § 353.56, which sets forth the criteria required for the allowance of COS adjustments to FMV. As described above, such adjustments are permitted to take account both of circumstances bearing "a direct relationship to the sales compared," 19 C.F.R. § 353.56(a)(1), and indirect expenses "incurred in selling such or similar merchandise" ("selling expenses"), 19 C.F.R. § 353.56(b)(2).

In light of the substantial deference accorded to Commerce when interpreting and applying its own regulations, we find no error in the Court of International Trade upholding Commerce's decision to make a COS adjustment to FMV to take account of NMB Thai's Route B freight costs. The parties do not dispute that Commerce's regulation, which permits adjustments for, *inter alia,* "selling expenses," is an authorized and reasonable administrative interpretation of the governing statute. Moreover, there is no dispute that such selling expenses may properly include freight costs. *See, e.g., Torring-*

foreign market value (or that the United States price is the same as the foreign market value) is wholly or partly due to:
...
(B) other differences in circumstances of sale;

...
then due allowance shall be made therefor.
The statute was subsequently amended in 1994 by Pub.L. 103–465 § 224.

ton Co. v. United States, 68 F.3d 1347, 1356 (Fed.Cir.1995); Sharp Corp. v. United States, 63 F.3d 1092, 1097 (Fed.Cir.1995). In determining that the two Route B freight costs at issue in this case were selling expenses properly the subject of a COS adjustment, Commerce was simply interpreting its own regulations. We give substantial deference to that interpretation. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) ("We must give substantial deference to an agency's interpretations of its own regulations. . . . [T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. . . . This broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." (citations and internal quotation marks omitted)); Oy v. United States, 61 F.3d 866, 873–75 (Fed.Cir.1995) (applying deference to Commerce's reasonable interpretation of its antidumping investigation "sunset" regulation); Asociacion Colombiana de Exportadores de Flores v. United States, 903 F.2d 1555, 1559, 8 Fed. Cir. (T) 126, 131 (Fed.Cir.1990) (attaching "substantial weight" to the Commerce Department, International Trade Administration's interpretation of its own regulation and explaining that "[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order" (citations and internal quotation marks omitted)); Smith–Corona, 713 F.2d at 1571, 1 Fed. Cir. (T) at 131–32 ("The Secretary of Commerce . . . has been entrusted with responsibility for implementing the antidumping law. The Secretary has broad discretion in executing the law.").

Commerce's interpretation of its regulation is not "plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ., 512 U.S. at 512, 114 S.Ct. 2381. Rather, its interpretation is a reasonable one in a complex field in which it has special and unique expertise. To interpret the regulation, as Torrington apparently suggests, to require Commerce to parse all freight costs to determine the intent behind such costs would, moreover, be administratively impracticable. Indeed, it is difficult to comprehend the method by which Commerce could be expected to divine the subjective intent behind the decision to transport merchandise by a particular method or along a particular route. For example, a decision to transport certain goods within the country of manufacture by rail rather than road might be due to government rail subsidies, high gasoline taxes, delivery timing requirements, or a combination of such factors. To expect Commerce to determine the specific business strategy behind the decision to use rail transport under such a scenario would be to expect the unattainable. Thus, under circumstances akin to the instant case, where the freight expenses are found directly or indirectly to support the relevant sales, it is appropriate for Commerce to avoid inquiring into the subjective intent behind the incurring of those expenses. Accordingly, we do not regard Commerce's interpretation of its regulation to be unreasonable when the alternative interpretation proffered by Torrington is utterly unworkable.

We also do not agree with Torrington's assertion that allowing NMB Thai a COS adjustment from FMV for the Route B freight expenses somehow vitiates the statutory and regulatory scheme or its policy goals. In support of this proposition, Torrington contends that by permitting NMB Thai this adjustment, Commerce is permitting an adjustment for an expenditure that does not affect price. However, Torrington does not point to any finding in the record substantiating its factual claim that these Route B freight expenses do not affect price. Indeed, notwithstanding any tax, customs, or bonding benefits, Torrington has not brought forward any evidence suggesting that the Thai customers of NMB Thai do not ultimately pay for the circuitous Route B freight costs. Or, to put it differently, Torrington has not produced any evidence that the Route B shipping route provides a net cost saving to Thai customers, only that the Route B costs are incurred to avoid expending the presumably greater costs associated

with the Thai tax penalty, customs, and bonding requirements. Accordingly, it is far from apparent that NMB Thai's customers in Thailand do not bear the expense of the roundabout Route B shipping arrangement and we, therefore, do not regard allowing this adjustment to be inconsistent with the overall statutory and regulatory scheme or its policy goals.

Finally, we are not persuaded that the regulation as interpreted by Commerce was applied unreasonably to the facts here.

## CONCLUSION

The decision of Commerce to permit NMB Thai a COS adjustment to FMV for its Route B freight expenses was based upon a reasonable interpretation and application of its own regulations. The judgment of the Court of International Trade upholding Commerce's decision is therefore

*AFFIRMED.*

ARCHER, Senior Judge, dissenting.

The decision of the Court of International Trade sustaining Commerce's deduction from foreign market value (FMV) of the Route B freight costs as home market selling expenses should in my view be reversed. Torrington is correct in arguing that under the governing statute and regulation Route B freight costs are not normal expenses related to home market sales but rather are additional costs incurred to obtain general benefits for the company, i.e., to preserve favorable VAT tax and export duty exemptions.

In general the antidumping statute and regulations seek to produce a fair, "apples-to-apples" comparison between FMV and United States price (USP). To achieve that end, adjustments are made to the base value of both FMV and USP to permit comparison of the two prices at a similar point in the chain of commerce. *See Torrington Company v. United States,* 68 F.3d 1347, 1352 (Fed.Cir. 1995). The USP is adjusted by deducting expenses incurred in selling the merchandise in the United States. *Id.* FMV is adjusted by deducting direct selling expenses under the *circumstances of sale* (COS) provision, 19 U.S.C. § 1677b(a)(4)(B) (1988). Moreover,

when the USP is based on the exporter's sales price (ESP), the FMV is reduced by the indirect selling expenses to the extent of the deduction for indirect selling expenses from USP. *See Torrington,* 68 F.3d at 1353.

Home market transportation costs have been considered by Commerce to be sales related and have been treated as selling expenses. *See Torrington,* 68 F.3d at 1355–56. As a result, post-sale transportation costs have been allowed as a COS adjustment. Pre-sale transportation costs (not related to any particular sale) have been allowed as indirect selling expenses when the USP is based on ESP. *Id.*

Deductions for transportation costs have previously been made for in-country transportation costs—transportation within the country in the normal course of home market sales. *See Cemex, S.A. v. United States,* 133 F.3d 897, 901 (Fed.Cir.1998) (in-country transportation for home market sales); *Sharp Corporation v. United States,* 63 F.3d 1092, 1093 (Fed.Cir.1995) (same). There is no evidence that Commerce has previously made an adjustment for transportation costs to and from a point outside the country in which home market sales occurred.

This court customarily gives Commerce the benefit of the doubt and defers to its determination, which is the predominant basis for the majority's decision, when it is interpreting its own regulations. In this case, however, Commerce's own verification clearly shows that the Route B transportation costs were not incurred in the process of selling, but were incurred in order to obtain import duty and VAT tax benefits for NMB Thai. To this end, the verification shows that these Route B transportation costs were incurred because bearings produced in their bonded factories "continue to carry duty-free status when they are exported" and when shipped back to related or unrelated Board of Investment (BOI) companies in Thailand they are treated as "duty-free" imported raw materials. The verification states that NMB Thai found it much simpler to import raw materials in this way. Because the verification establishes the reasons why NMB Thai used the circuitous transportation route, it was not necessary for Commerce to delve

into the "subjective intent behind the decision to transport merchandise by a particular method or along a particular route," which is one of the principal concerns of the majority. In this case, the reasons are clear in the verification record and establish that the added transportation costs cannot properly be classified as a form of selling expense.

It is evident in this case that Commerce did not make an "apples to apples" comparison. By allowing an adjustment for a transportation diversion of the nature and magnitude as here involved, Commerce has not made an adjustment in arriving at FMV which reaches the similar point in the chain of commerce to make a proper comparison with the USP. Torrington correctly argues that the excess transportation costs were in the nature of general and administrative overhead costs "related to the company's overall corporate strategy to reduce costs generally and reduce its tax and duty burdens specifically." Selling expenses are commonly understood to be expenses made to support and promote sales. *See NSK v. United States,* 115 F.3d 965, 974 (Fed.Cir. 1997) (when terms not explicitly defined should be given their "ordinary meaning").[1] The commonly understood definition of selling expenses was not applied here.

I would, therefore, reverse the decision below and remand the case to Commerce to make a transportation adjustment in an amount that reflects what would be a normal transportation cost to Route B customers of NMB Thai.

1. Torrington concedes that an adjustment for some transportation costs might be appropriate if NMB Thai can show what it would have cost to ship directly to Route B customers.