**The TORRINGTON COMPANY, Plaintiff and Defendant–Intervenor,**

v.

**The UNITED STATES, Defendant,**

**and**

**NMB Singapore Ltd., Pelmec Industries (Pte.) Ltd. and NMB Corporation, Defendants–Intervenors and Plaintiffs.**

**Slip Op. 97–57.**
**Court No. 95–03–00351.**

United States Court of
International Trade.

May 14, 1997.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., Amy S. Dwyer, Olufemi Areola and Timothy C. Brightbill, Washington, DC), for plaintiff and defendant-intervenor The Torrington Company.

White & Case (Walter J. Spak, William J. Clinton and David E. Bond, Washington, DC), for NMB Singapore Ltd., Pelmec Industries (Pte.) Ltd. and NMB Corporation.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis); of counsel: Michelle K. Behaylo, Stacy J. Ettinger and Dean A. Pinkert, Attorney–Advisors, Washington, DC, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

### *OPINION*

TSOUCALAS, Senior Judge.

Plaintiff and defendant-intervenor The Torrington Company ("Torrington") moves this Court pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging aspects of the final determination of the Department of Commerce, International Trade Administration ("Commerce"), of the fourth administrative review of antifriction bearings ("AFBs") from Singapore, entitled *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews. Partial Termination of Administrative Reviews. and Revocation in Part of Antidumping Duty Orders* ("*Final Results*"), 60 Fed.Reg. 10,900 (1995). Defendant-intervenors and plaintiffs NMB Singapore Ltd., Pelmec Industries (Pte.) Ltd. and NMB Corporation (collectively "NMB") oppose Torrington's motion and also challenge Commerce's fourth administrative review of AFBs from Singapore.

### *Background*

On May 15, 1989, Commerce published the antidumping duty orders on AFBs from Singapore. *See Antidumping Duty Order of Sales at Less Than Fair Value: Ball Bear-*

*ings and Parts Thereof From Singapore,* 54 Fed.Reg. 20,907 (1989). The fourth administrative review encompasses imports of AFBs entered during the period of May 1, 1992 through April 30, 1993. The present consolidated action concerns imports from Singapore.

On February 28, 1994, Commerce published the preliminary results of the fourth administrative review. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, Thailand, and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Notice of Intent To Revoke Orders (in Part),* 59 Fed.Reg. 9,463 (1994). On February 28, 1995, Commerce published the Final Results at issue. *See Final Results,* 60 Fed.Reg. at 10,900.

Torrington contests the following actions of Commerce: (1) accepting reporting of NMB of home market and U.S. billing adjustments and discounts; and (2) relying on NMB's air and ocean freight expenses reported on a commingled basis.

NMB claims that Commerce erred by including research and development ("R & D") expenses related to non-scope merchandise in the calculation of cost of production and constructed value and by failing to allocate R & D expenses of Minebea Co., Ltd. ("Minebea Japan") over total consolidated cost of sales.

On May 3, 1995, the Court granted Torrington's motion for a preliminary injunction enjoining the liquidation of the subject entries for the duration of this litigation.

## *Discussion*

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Billing Adjustments and Discounts*

Torrington contests Commerce's acceptance of NMB's reporting of various billing adjustments on U.S. and home market sales. Torrington alleges that the billing adjustments reported do not accurately reflect U.S. and home market sales because a variety of the adjustments may have been made as much as five years or more after the sales under review. Torrington stresses that because verification did not occur until December 1993 and January 1994, Commerce could have verified whether additional billing adjustments were made after June 1993.[1] According to Torrington, Commerce had an obligation to investigate whether the submitted prices should have been relied upon in light of the fact that NMB's reported sales prices may be changed for a period of five years or more after the period under review. Torrington's Mem. Supp. Mot. J. Agency R. at 11–14.

Torrington further argues that Commerce's treatment of NMB's billing adjustments was inconsistent with its treatment of other post-sale price adjustments ("PSPAs"). Torrington explains that while Commerce generally requires PSPAs to be tied directly to the sales under consideration, in this instance, Commerce relied on prices based on billing adjustments that may have occurred up to five years after the original sales. To

---

1. NMB stated in its supplemental questionnaire response that only "sales adjustments through the end of June 1993 were traced to original sales." *Response of NMB to Supplemental Questionnaire,* P.R. Doc. No. 35, at 7, Torrington's App., Tab B.

avoid the use of strategies intended to reduce antidumping duty liability, Torrington asserts that Commerce should have at least disallowed favorable adjustments to U.S. and home market prices. Torrington requests a remand for Commerce either to disregard all of the U.S. and home market sales information reported by NMB or to apply best information available ("BIA") with respect to reported billing adjustments. *Id.* at 14–16.

Commerce counters that it was not required to resort to BIA with respect to NMB's billing adjustments because NMB submitted a complete and accurate response to Commerce's request for information. Def.'s Partial Opp'n to Mots. J. Agency R. at 4. Commerce further responds that Torrington failed to exhaust its administrative remedies regarding its contention that Commerce should have disregarded NMB's entire U.S. and home market sales database. Commerce contends that at the administrative level Torrington only asserted that. Commerce should have used partial BIA for NMB's billing adjustments and never questioned the reliability of NMB's entire home market and U.S. sales database. *Id.* at 5–7.

In the alternative, Commerce maintains that Torrington's concerns regarding NMB's billing adjustments and sales database are not warranted as they are based on speculation and conjecture rather than record evidence. Commerce argues that it was unlikely that any significant quantity of billing adjustments relating to sales during the period of review occurred after the period covered by the response, and that any possible additional adjustments could serve either to decrease or increase the margins. Commerce further states that it accepted and verified the accuracy of NMB's database after concluding it was not possible for NMB to report billing adjustments that had not yet occurred by the time of the deadline for filing a questionnaire response. Commerce defends its need for setting deadlines and states that, given the necessary time constraints, NMB's reporting of its billing adjustments and U.S. and home market sales was complete. *Id.* at 7–9.

Defendant-intervenor and plaintiff NMB asserts that in accordance with Commerce's instructions, it reported billing adjustments on a transaction-specific basis. NMB insists that Commerce's on-site thorough verification revealed only one minor discrepancy. NMB further maintains that billing adjustments by definition occur after sales are made and, therefore, should be considered part of the original sales transactions regardless of when they are made. NMB's Opp'n to Mot. J. Agency R. at 3–6.

In rebuttal, Torrington argues that emphasizing the lack of discrepancies found at verification misses the point that Commerce failed to investigate further the potential for billing adjustments to occur several years after the original sales. In so doing, Torrington alleges that Commerce abdicated its responsibilities under the antidumping statute. Torrington's Reply to Opp'n to Mot. J. Agency R. at 6.

Commerce explained its treatment of NMB's home market and U.S. billing adjustments in the Final Results as follows:

> The reporting of all HM [home market] billing adjustments during the POR [period of review] was not possible because the billing adjustments had not yet occurred by the deadline for filing the response. We verified NMB/Pelmec Singapore's reported billing adjustments and found them to be reported in accordance with our questionnaire instructions, and therefore have accepted the billing adjustments as reported.
>
> . . . .
>
> We verified quantity and billing adjustments in the United States. We found that quantity and billing adjustments were properly reported, with one exception. At verification, we discovered a discrepancy regarding a relatively small billing adjustment. However, because the discrepancy involved was an isolated incident, we have accepted NMB/Pelmec's quantity and billing adjustments as reported.

*Final Results,* 60 Fed.Reg. at 10,929.

Commerce's acceptance of NMB's billing adjustments on U.S. and home market sales was adequately supported by the record and law. Commerce did not abdicate any of its responsibilities under the statute

as it fully verified the accuracy of NMB's reporting. *See NMB Thailand & NMB Singapore U.S. Sales Verification Report,* P.R. Doc. No. 41, at 3, Torrington's App., Tab B. Torrington's suggestion that Commerce should have asked for further information regarding billing adjustments occurring between the date the questionnaire responses were due and verification would create new burdens on Commerce that are not required by the statute. "Congress has imposed strict statutory deadlines upon Commerce in antidumping investigations." *Empresa Nacional Siderurgica, S.A. v. United States,* 19 CIT ——, ——, 880 F.Supp. 876, 879 (1995) (citing 19 U.S.C. § 1673d(a)). Torrington's proposal creates a burden on Commerce not mandated by the statute. While Commerce certainly possesses the discretion to request further information from respondents pursuant to 19 C.F.R. § 353.31(b) (1995), requiring Commerce to constantly request further information from respondents will unnecessarily prolong the process of investigation.

In addition, an examination of NMB's supplemental questionnaire appendix containing a debit/credit matching detail list indicates that while billing adjustments did occur after the sales, more often than not, the billing adjustments occurred within one year of the sales. *See Response of NMB to Supplemental Questionnaire,* P.R. Doc. No. 35, Attach. 5, Torrington's App., Tab B. After examining the hundreds of sales reported by NMB, the Court located only seven instances of more than a three year discrepancy between sales and adjustments. Id. These minor deviations were not enough to call into question the accuracy of all of the sales information reported by NMB.

Finally, Torrington's proposed solution would only address billing adjustments granted within two years of the original sales. Torrington stresses the possibility of adjustments occurring five years after the sales, yet requiring Commerce to further investigate sales in between the time questionnaire responses were due and verification would only have revealed adjustments that

possibly occurred within two years after the period of review sales. Basically, investigating transactions for another six months would not have increased the reliability of the investigation to such an extent as to justify imposing this extra burden on Commerce.[2]

### 2. *Air and Ocean Freight Expenses*

Torrington contends that Commerce erred in accepting NMB's reported air and ocean freight expenses on a commingled basis. According to Torrington, NMB failed to comply with questionnaire instructions to report air and ocean freight expenses on "a per unit and transaction-by-transaction basis." Torrington's Mem. Supp.Mot.J.Agency R. at 16.

Torrington also points out that NMB did not separate air freight expenses from ocean freight expenses on a customer-specific basis in spite of a request from Commerce to do so in a deficiency letter. Torrington challenges NMB's claim and Commerce's final determination that NMB could not link each shipment to individual U.S. sales. Torrington argues that Commerce's verification of NMB's response revealed that sales could be linked to shipments and, therefore, Commerce's acceptance of NMB's reporting methodology was not supported by the record. Torrington requests a remand requiring Commerce to resort to BIA. *Id.* at 16–18.

Commerce counters that it properly accepted NMB's reported air and ocean freight expenses once it recognized that in exporter's sales price ("ESP") transactions, there is often no direct link between specific shipments and individual sales. Commerce maintains that none of the documents cited by Torrington establishes a direct link between a specific shipment and an individual sale. Commerce concludes that because it determined that NMB's methodology was reasonable and representative, resorting to BIA would not have been appropriate. Def.'s Partial Opp'n to Mots. J. Agency R. at 10–12. NMB essentially agrees with the arguments advanced by

---

**2.** Because the Court has determined that Commerce's acceptance of NMB's billing adjustments was consistent with law, it is not necessary to address either Torrington's concerns regarding

the validity of all of NMB's home market and U.S. sales data or Commerce's contention that Torrington failed to exhaust administrative remedies with respect to this issue.

Commerce. NMB's Opp'n to Mot. J. Agency R. at 6–7.

In the Final Results, Commerce stated the following reason for accepting NMB's reporting of air and ocean freight expenses:

In the case of ESP transactions made by NMB/Pelmec, there is often no direct link between shipments and resales. Therefore, because we verified NMB/Pelmec's air and ocean freight expenses and found them to have been reasonably allocated, we have accepted NMB/Pelmec's freight expense calculations.

60 Fed.Reg. at 10,942.

This Court has previously acknowledged Commerce's authority under certain circumstances to accept averages rather than transaction-specific data as long as the methodology chosen by a respondent is reasonable and supported by information contained in the administrative record. *See Torrington Co. v. United States,* 17 CIT 967, 972, 832 F.Supp. 405, 410 (1993). The "key issue is that [Commerce] must closely examine the proposed methodology and make a determination that it is reasonable and representative." *Id.* Commerce "cannot simply accept a respondent's methodology without investigation." *Id.*

In *INA Walzlager Schaeffler KG v. United States,* 21 CIT ——, ——, 957 F.Supp. 251, 272–73 (1997), the Court upheld Commerce's decision to accept a respondent's sample methodology after determining that Commerce had adequately verified that the samples were representative of the incurred freight costs. Thus, the issue in the case at bar is whether Commerce properly verified that the information reported by NMB was reasonable and representative of air and ocean freight expenses.

NMB responded to Commerce's request for information regarding ocean freight in its questionnaire as follows:

NMB Singapore and Pelmec Singapore separately contract with freight forwarders which pick up the subject merchandise from the factory, deliver it to the port and arrange for brokerage, handling and ocean freight. The freight forwarders send a single invoice which covers all of the charges for freight from factory to port, brokerage and handling, and ocean freight. It would be extremely difficult to segregate and report each of these expenses. Consequently, ocean freight includes domestic brokerage and handling ... and freight from factory to port of export. ...

*Section B Questionnaire Response,* P.R. Doc. No. 13, at 27–28, Torrington's App., Tab B. In a supplemental request for information, Commerce requested NMB to report air freight expenses and to "identify which sale to which customer, involved air freight." *Supplemental Questionnaire,* P.R. Doc. No. 30, at 3, Torrington's App., Tab B. In response, NMB stated: "In some cases, shipments of the subject merchandise from the factory to NMB Corp. were made by air. However, it [was] not possible to link each shipment from the factory to individual U.S. sales for [the] purpose of reporting ocean freight in the U.S. sales listing." *Response of NMB to Supplemental Questionnaire* P.R. Doc. No. 35, at 13, Torrington's App., Tab B.

An examination of the record supports Commerce's decision to accept NMB's reporting methodology. The documents cited by Torrington do not provide a means of linking individual sales to specific shipments. First, Torrington refers to NMB's questionnaire response indicating that NMB computes the average time period during which merchandise remains in the warehouse on the basis of each sales invoice. *See Section B Questionnaire Response,* P.R. Doc. No. 13, at 40–41, Torrington's App., Tab B. This information only provides a means of determining the average amount of time merchandise rests in the warehouse before resale to an unrelated customer. It does not link particular sales to particular shipment costs. Torrington also points to NMB's factory-specific inventory records to support its contention. These records reveal the inventory carrying costs of different sized roller bearings over periods of time. Id. at Attach. 24. Again, the Court does not view this document as evidence of a means of linking specific sales to specific shipments.

Finally, Torrington cited Commerce's verification of NMB's ESP sales. Commerce described its ESP sales trace as follows:

The sales trace consisted of two parts: the first involved documentation tracing the purchase order to the shipment and the second involved documentation tracing the payment and flow of funds through NMB's accounting system.

*NMB Thailand & NMB Singapore U.S. Sales Verification Report,* P.R. Doc. No 41, at 6, Torrington's App., Tab B. Commerce further explained that it traced the purchase order to the invoice and then matched the documents to the customer name, part number, volume and price. The same information was then confirmed on the packing slip which served as verification of shipment. *Id.* The second part of the analysis involved tracing the invoices to proof of payment by examining the check received from the customer. *Id.* Again, the freight cost was not linked to the particular sale because it does not account for the fact that once merchandise reaches the U.S., it remains at NMB Corp.'s inventory before it is sold. *See NMB's Rebuttal Brief,* P.R. Doc. No. 56, at 7, Def.'s App., Ex. 2. Thus, while it is possible to compute ocean and air freight expenses separately on a transaction-by-transaction basis for shipments from Singapore to NMB's subsidiary in the U.S., it is not possible to then link the cost to the actual sale from the U.S. subsidiary's inventory. See *id.* Basically, the stream of documents cited by Torrington, at most, provides a mechanism for approximately matching shipments to sales. The documents do not, however, negate NMB's assertion and Commerce's final determination that "there is often no direct link between shipments and resales." 60 Fed.Reg. at 10,942.

■ Once Commerce determined that it could not link specific sales to specific shipments, Commerce properly verified that the expenses were reasonably allocated. Id. Commerce, therefore, satisfied its duty to investigate the methodology proposed by the respondent to determine whether it was "reasonable and representative." *Torrington,* 17 CIT at 972, 832 F.Supp. at 410. The Court affirms Commerce's determination on this issue.

### 3. *NMB's Research and Development Expenses*

NMB contends that Commerce erred by including R & D expenses directly related to non-subject merchandise in its calculations of cost of production and constructed value. NMB emphasizes that pursuant to the antidumping statute and governing regulations, Commerce may only include in cost of production and constructed value, manufacturing costs and general expenses relating to the class or kind of merchandise subject to the antidumping duty order. NMB maintains that because record evidence demonstrated that the R & D expenses incurred by Minebea Japan related directly to nonsubject merchandise, Commerce's addition of these expenses to NMB/Pelmec Singapore's cost of production and constructed value was inconsistent with law. NMB's Mem.Supp.Mot.J. Agency R. at 11–13.

In the alternative, NMB requests a remand for Commerce to allocate the expenses over Minebea Japan's total consolidated cost of sales rather than over only a small portion of Minebea Japan's operations. *Id.* at 14–15.

Commerce responds that NMB failed to provide Commerce with relevant information about the distribution of R & D expenses to specific projects. Commerce further claims that NMB has failed to demonstrate to this Court that all of the R & D costs incurred by Minebea Japan were incurred with respect to non-subject merchandise. Def.'s Partial Opp'n to Mots. J. Agency R. at 21–22.

Commerce consents to a remand, however, to recalculate NMB/Pelmec's cost of production and constructed value after allocating Minebea Japan's R & D expenses over its total consolidated cost of sales, rather than over the subject merchandise. *Id.* at 22–23.

Torrington, defendant-intervenor, agrees with Commerce's conclusion that NMB failed to demonstrate that the R & D expenses were not related to the subject merchandise. Torrington objects to a remand, however, claiming that NMB failed to request a reallocation of the R & D expenses at the administrative level. Torrington's Opp'n to Mot. J. Agency R. at 4–12.

In rebuttal, NMB argues that Commerce is not permitted by law to make an adverse assumption regarding the calculations of dumping margins without first requesting further information. NMB maintains that Commerce never provided NMB with a meaningful opportunity to explain the purpose for which Minebea Japan incurred the R & D expenses at issue. NMB's Reply to Opp'n to Mot. J. Agency R. at 4–8.

Commerce explained its treatment of NMB's R & D expenses in the Final Results as follows:

> The Department agrees with Torrington's argument that the respondent failed to demonstrate that the benefits of Minebea Japan's R & D efforts are limited to non-subject merchandise. NMB/Pelmec's argument that the financial report only discusses R & D that relates to nonsubject products is flawed. The same report discusses how the Minebea Group developed a new washing system for ball bearings that it intends to have installed in all their plants worldwide by the end of March 1993. Furthermore, we find irrelevant NMB/Pelmec's argument that the list of current R & D projects that the Department reviewed did not contain R & D specifically related to bearings. We verified through Minebea Japan's financial statements that it amortizes the cost of its R & D over a 5–year period. Accordingly, the current list of R & D projects does not reflect the capitalized costs of prior year projects currently being expended as an operating cost. Therefore, it is appropriate to allocate R & D costs to NMB/Pelmec and we have included these expenses in the COP [cost of production] and CV [constructed value].

60 Fed.Reg. at 10,921.

■ Minebea Japan's annual report states that research and development expenses relate to future products and "are recorded as deferred research and development costs and amortized on a straight-line basis over five years." *1992 Annual Report of Minebea Co., Ltd.,* at 26, NMB's App., Ex. 3. The annual report also explained that it plans to invest in the installation of new washing systems in its plants "worldwide" by the end of March 1993. *Id.* at 11. These statements, combined with NMB's failure to demonstrate that Minebea Japan's R & D expenses are definitely limited to non-subject merchandise, supports Commerce's decision to include these expenses in its cost of production and constructed value calculations. As the annual report indicates, however, these costs related to all of Minebea Japan's production and, therefore, should have been allocated over Minebea Japan's total consolidated cost of sales. The Court agrees with NMB and Commerce that a remand is necessary for Commerce to recalculate NMB's cost of production and constructed value after allocating Minebea Japan's R & D expenses over its total consolidated cost of sales, rather than over only the subject merchandise.

*Conclusion*

In accordance with the foregoing opinion, this case is remanded to Commerce to allow it to recompute NMB's cost of production and constructed value after allocating Minebea Japan's R & D expenses over its total consolidated cost of sales. Commerce is affirmed as to all other issues raised herein.

The remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date the responses or comments are due.

*ORDER*

This Case having been duly submitted for a decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), to recalculate NMB's constructed value and cost of production after allocating research and development costs of Minebea Co., Ltd. over total consolidated cost of sales; and it is further

**ORDERED** that Commerce is affirmed with respect to all other issues raised herein; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date the responses or comments are due.

