**Slip Op. 00-16**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____

SIGMA CORPORATION, U.V. INTERNATIONAL, SOUTHERN STAR, INC., CITY PIPE and FOUNDRY, INC. and LONG BEACH IRON WORKS, INC.;

OVERSEAS TRADE CORPORATION;

D&L SUPPLY CO.;

DEETER FOUNDRY, INC., ALHAMBRA FOUNDRY, INC., ALLEGHENY FOUNDRY CO., BINGHAM & TAYLOR DIVISION, VIRGINIA INDUSTRIES, INC., CAMPBELL FOUNDRY CO., CHARLOTTE PIPE & FOUNDRY CO., EAST JORDAN IRON WORKS, INC., LEBARON FOUNDRY INC., MUNICIPAL CASTINGS, INC., NEENAH FOUNDRY CO., OPELIKA FOUNDRY CO., INC., PINKERTON FOUNDRY INC., TYLER PIPE INDUSTRIES, INC., U.S. FOUNDRY & MANUFACTURING CO. and VULCAN FOUNDRY, INC.,

          Plaintiffs,

        v.

UNITED STATES,

          Defendant,

D&L SUPPLY CO.;

DEETER FOUNDRY, INC., <u>et al.</u>,

         Defendant-Intervenors.

_____

Consol. Court No. 91-02-00154

_____
                                  :

SIGMA CORPORATION, SOUTHERN STAR, INC., :
CITY PIPE and FOUNDRY, INC. and         :
LONG BEACH IRON WORKS, INC.;             :
                                    :
OVERSEAS TRADE CORPORATION;              :
                                    :
GUANGDONG METALS & MINERALS IMPORT & :
EXPORT CORPORATION;                      :
                                    :
U.S. FOUNDRY & MANUFACTURING CO.,    :
ALHAMBRA FOUNDRY, INC., ALLEGHENY    :
FOUNDRY CO., BINGHAM & TAYLOR DIVISION, :
VIRGINIA INDUSTRIES, INC., CHARLOTTE  :
PIPE & FOUNDRY CO., DEETER FOUNDRY    :
INC., EAST JORDAN IRON WORKS, INC.,   :
LEBARON FOUNDRY INC., MUNICIPAL      :
CASTINGS, INC., NEENAH FOUNDRY CO.,   :
OPELIKA FOUNDRY CO., INC., TYLER PIPE  :
INDUSTRIES, INC. and VULCAN         :   Consol. Court No.
FOUNDRY, INC.,                   :   92-04-00283
                                    :
                Plaintiffs,     :
                                    :
U.V. INTERNATIONAL,              :
                                    :
        Plaintiff-Intervenor,   :
                                    :
                v.              :
                                    :
UNITED STATES,                   :
                                    :
                Defendant,     :
                                    :
GUANGDONG METALS & MINERALS IMPORT   :
& EXPORT CORPORATION;            :
                                    :
U.S. FOUNDRY & MANUFACTURING CO.,    :
et al.,                         :
                                    :
        Defendant-Intervenors.  :
_____:

Plaintiffs/defendant-intervenors D&L Supply Co. ("D&L") and Guangdong Metals & Minerals Import & Export Corporation ("Guangdong") contest the Department of Commerce, International Trade Administration's ("Commerce") results in <u>Amended Final Results of Redetermination Pursuant to Court Remand, Sigma Corp. v. United States, Consol. Court Nos. 91-02-00154, 92-04-00283</u> ("<u>Remand Results</u>") (Jan. 30, 1998). Specifically, D&L claims that Commerce erred in: (1) including freight costs in import values in addition to those for ocean and foreign inland freight; (2) employing a method to calculate the antidumping percentage that overstated the margin percentage; and (3) overstating the packing expenses. Guangdong claims that Commerce erred in: (1) including freight costs in import values in addition to those for ocean and foreign inland freight; (2) overstating the factory overhead percentage; (3) employing a method to calculate the antidumping percentage that overstated the margin percentage; and (4) overstating the packing expenses. D&L and Guangdong request another remand to correct the errors.

Plaintiffs/defendant-intervenors Deeter Foundry, Inc., Alhambra Foundry, Inc., Allegheny Foundry Co., Bingham & Taylor Division, Virginia Industries, Inc., Campbell Foundry Co., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., LeBaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Pinkerton Foundry, Inc., Tyler Pipe Industries, Inc., U.S. Foundry & Manufacturing Co. and Vulcan Foundry, Inc. (collectively "domestic industry") also contest Commerce's <u>Remand Results</u> and request another remand. The domestic industry claims that Commerce understated the factory overhead percentage.

**Held:** D&L's request for a remand is denied. Guangdong's request for a remand is denied. The domestic industry's request for a remand is denied.

[<u>Remand Results</u> are affirmed in all respects.]

Dated: February 10, 2000

<u>Ross & Hardies</u> (<u>Jeffrey S. Neeley</u>) for plaintiff Overseas Trade Corporation.

<u>White & Case</u> (<u>Walter J. Spak</u>, <u>Vincent Bowen</u> and <u>Edmund W. Sim</u>) for plaintiffs Sigma Corporation, Southern Star, Inc., City Pipe and Foundry, Inc., Long Beach Iron Works, Inc. and for

plaintiff/plaintiff-intervenor U.V. International.

Collier, Shannon, Rill & Scott, PLLC (Paul C. Rosenthal, Mary T. Staley and Robin H. Gilbert) for plaintiffs/defendant-intervenors Deeter Foundry, Inc., Alhambra Foundry, Inc., Allegheny Foundry Co., Bingham & Taylor Division, Virginia Industries, Inc., Campbell Foundry Co., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., LeBaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Pinkerton Foundry Inc., Tyler Pipe Industries, Inc., U.S. Foundry & Manufacturing Co. and Vulcan Foundry, Inc.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director, and Reginald T. Blades, Jr.); of counsel: Linda S. Chang, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Cameron & Hornbostel LLP (Dennis James, Jr.) for plaintiffs/defendant-intervenors D&L Supply Co. and Guangdong Metals & Minerals Import & Export Corporation.

### OPINION

**TSOUCALAS, Senior Judge:** Plaintiffs/defendant-intervenors D&L Supply Co. ("D&L") and Guangdong Metals & Minerals Import & Export Corporation ("Guangdong") contest the Department of Commerce, International Trade Administration's ("Commerce") results in Amended Final Results of Redetermination Pursuant to Court Remand, Sigma Corp. v. United States, Consol. Court Nos. 91-02-00154, 92-04-00283, ("Remand Results") (Jan. 30, 1998). Specifically, D&L claims that Commerce erred in: (1) including freight costs in import values in addition to those for ocean and foreign inland freight; (2) employing a method to calculate the antidumping

percentage that overstated the margin percentage; and (3) overstating the packing expenses. Guangdong claims that Commerce erred in: (1) including freight costs in import values in addition to those for ocean and foreign inland freight; (2) overstating the factory overhead percentage; (3) employing a method to calculate the antidumping percentage that overstated the margin percentage; and (4) overstating the packing expenses. D&L and Guangdong request another remand to correct the errors.

Plaintiffs/defendant-intervenors Deeter Foundry, Inc., Alhambra Foundry, Inc., Allegheny Foundry Co., Bingham & Taylor Division, Virginia Industries, Inc., Campbell Foundry Co., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., LeBaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Pinkerton Foundry, Inc., Tyler Pipe Industries, Inc., U.S. Foundry & Manufacturing Co. and Vulcan Foundry, Inc. (collectively "domestic industry") also contest Commerce's Remand Results and request another remand. The domestic industry claims that Commerce understated the factory overhead percentage.

**BACKGROUND**

On September 8, 1997, the Court issued orders remanding consolidated court numbers 91-02-00154 and 92-04-00283 to Commerce.[1]  See Sigma Corp. v. United States ("Sigma I"), Slip Op. No. 97-125, 1997 WL 739595 (CIT Sept. 8, 1997); Sigma Corp. v. United States ("Sigma II"), Slip Op. No. 97-126, 1997 WL 739611 (CIT Sept. 8, 1997).  The remand was ordered pursuant to the decision (July 7, 1997) and mandate (Aug. 29, 1997) of the Court of Appeals for the Federal Circuit ("CAFC"), directing Commerce to: (1) recalculate the value of the freight component of foreign market value ("FMV") for the 1987-89 and 1989-90 reviews; (2) adequately support its determination of surrogate factory overhead for the 1989-90 review; and (3) replace the invalidated dumping margin as the value for the best information available for the

---

[1]     Consolidated court number 91-02-00154 involves Commerce's final results for the 1987-89 administrative review of the Antidumping Duty Order; Iron Construction Castings From the People's Republic of China (the PRC), 51 Fed. Reg. 17,222 (May 9, 1986).  See Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 56 Fed. Reg. 2,742 (Jan. 24, 1991). Consolidated court number 92-04-00283 involves Commerce's final results for the 1989-90 administrative review.  See Final Results of Antidumping Duty Administrative Review: Certain Iron Construction Castings From the People's Republic of China, 57 Fed. Reg. 10,644 (Mar. 27, 1992). Since both cases involve almost identical facts and because the Court of Appeals for the Federal Circuit considered the cases together, this Court will consider and refer to them as a single matter.  The Court, however, will not address every aspect of this case's long procedural history.  Only those details relevant to the matters at issue will be discussed.

1989-90 review.

On December 12, 1997, Commerce released draft remand results in this action and invited interested parties to comment.  After receiving comments from certain United States importers and from the domestic industry, Commerce filed its <u>Final Results of Redetermination Pursuant to Court Remand, Sigma Corp. v. United States, Consol. Court Nos. 91-02-00154, 92-04-00283</u> (Jan. 21, 1998).  Commerce subsequently released the <u>Amended Final Results of Redetermination Pursuant to Court Remand, Sigma Corp. v. United States, Consol. Court Nos. 91-02-00154, 92-04-00283</u> ("<u>Remand Results</u>") (Jan. 30, 1998) upon discovering and correcting a clerical error.

D&L, Guangdong and the domestic industry contest the <u>Remand Results</u> and request another remand.  The issue before the Court is whether the <u>Remand Results</u> complied with the remand instructions contained in the orders issued by the Court pursuant to the decision and mandate of the CAFC.[2]

---

[2]     Since the administrative reviews at issue were initiated before January 1, 1995, the applicable law is the antidumping statute as it existed prior to the amendments made by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). <u>See</u> <u>Torrington Co. v. United States</u>, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

**JURISDICTION**

The Court retains jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

**STANDARD OF REVIEW**

The Court will uphold Commerce's final results of redetermination pursuant to the Court's remand unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994).

**DISCUSSION**

**I.   Freight Costs**

The CAFC determined that the method used by Commerce to calculate the freight component of FMV resulted in overstatement of that value. See Sigma Corp. v. United States ("Sigma III"), 117 F.3d 1401, 1407 (Fed. Cir. 1997). The CAFC described Commerce's method as follows:

> [Commerce] started with the import price of pig iron in the [surrogate country], i.e., the price of pig iron delivered to port in the [surrogate country], with foreign inland and ocean freight expenses already included. Commerce then ascertained the distance from the pig iron mill in China to the foundry and added a constructed freight cost for that distance to the [surrogate country] import price.

Id. The CAFC criticized Commerce's assumption that the price of domestically produced pig iron was equal to the import price and

"that [,therefore,] a Chinese iron castings manufacturer would purchase domestic pig iron at the import price, rather than imported pig iron at the import price, regardless of the respective freight costs for inland transportation of the domestic and imported pig iron." Id. at 1408. The CAFC reasoned that instead, a manufacturer would minimize its costs "by purchasing imported pig iron if the cost of transportation from the port to the foundry were less than the cost of transportation from the domestic pig iron mill to the foundry." Id. Accordingly, this Court ordered Commerce to recalculate constructed FMV using a method that does not double-count ocean freight and foreign inland freight. See Sigma I, at *1; Sigma II, at *1.

On remand, Commerce altered its method of valuation. Commerce described its method in the Remand Results as follows:

> [A]ll [pig iron] inputs were revalued to include the surrogate CIF price plus a value for freight based on the shorter of the reported distances from either the closest PRC seaport to the castings foundry or from the PRC domestic materials supplier to the foundry.[3]

Remand Results at 3.

---

[3] The CIF (cost, insurance and freight) import price includes ocean and foreign inland freight. See Amended Final Results of Redetermination Pursuant to Court Remand, Sigma Corp. v. United States, Consol. Court Nos. 91-02-00154, 92-04-00283, p. 10 (Jan. 30, 1998).

The Court finds that Commerce's decision to add a freight value based on the reported distances in China to the surrogate CIF price was supported by substantial evidence.[4]  As the government states, adding to CIF price "an amount for inland freight in China from the nearest of the place of importation or the actual supplier represents a market value for providing the input to the manufacturer at the location of that manufacturer's plant." Def.'s Reply Comments Upon the Remand Results ("Def.'s Comments") at 4.

Contrary to the contentions of D&L and Guangdong, the CIF surrogate price alone does not properly account for the entire cost of freight.  See Def.-Intervenor D&L Supply Co.'s Comments on the Remand Results ("D&L's Comments") at 2; Def.-Intervenor Guangdong Metals & Minerals Import & Export Corp.'s Comments on the Remand Results ("Guangdong's Comments") at 3.  The CIF import price "includes the inland freight required to transport materials from the point of production to the point of export, and, the ocean freight required to transport the goods from the country of origin" to the surrogate country.  Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 56 Fed. Reg. 2,742, 2,746 (Jan. 24, 1991).

---

[4]     Using both surrogate and actual values to determine foreign market value in a nonmarket economy country is permitted under 19 U.S.C. § 1677b (1988).  See Lasko Metal Products, Inc. v. United States, 43 F.3d 1442 (Fed. Cir. 1994).

Thus, this price represents the cost to get the raw materials to the Chinese port, but it does not include the freight cost incurred by a producer to get the materials from the Chinese port to the castings foundry. The inland freight cost is necessary to account for that additional transportation cost.

Furthermore, the CAFC did not instruct that any freight in addition to ocean and foreign inland freight be eliminated altogether; rather, it objected to the particular method chosen by Commerce to calculate the freight component of FMV. Specifically, the CAFC stated:

> Simply put, the import prices in the [surrogate country] already included ocean freight and foreign inland freight, a substantial portion of the total cost of transporting imported pig iron from the pig iron mill to the foundry. By adding a constructive freight charge *for the entire trip from the mill to the foundry in China* on top of the import prices in the [surrogate country], Commerce's methodology double-counted a substantial component of the total freight expense.

Sigma III, 117 F.3d at 1407-08 (emphasis supplied). Thus, the CAFC rejected Commerce's approach of adding a freight cost for the entire trip from the mill to the foundry in China on top of the CIF import price. Commerce's method in the Remand Results eliminates this concern since it adds only that portion for freight not already accounted for in the CIF price--the cost of transporting pig iron from the port to the castings foundry. Because Commerce's method of calculating freight is supported by

substantial evidence, Commerce is affirmed.

## II.  Factory Overhead Percentage

In 1991, Commerce obtained a cable from the United States embassy in Pakistan containing information on overhead rates at castings foundries in that country.  See Final Results of Antidumping Duty Administrative Review: Certain Iron Construction Castings From the People's Republic of China, 57 Fed. Reg. 10,644, 10,645 (Mar. 27, 1992).  The cable data pertained to the cost breakdown for "a large Lahore-based foundry," which Commerce had used to calculate the surrogate overhead value for Guangdong's foundries. Remand Results at 4-5.  There was, however, no definite way to ascertain whether the Lahore-based foundry was comparable in size to the Guangdong foundries and, therefore, whether the use of the Lahore-based foundry data to calculate the Guangdong surrogate values was appropriate.  Consequently, the CAFC determined that Commerce's use of the single cable to calculate the surrogate value for the factory overhead component of FMV was not supported by substantial evidence.  See Sigma III, 117 F.3d at 1410.  This Court remanded the matter and ordered Commerce to obtain more information

> from its representatives in Pakistan with regard to the
> size of the "large Lahore-based foundry," and whether the
> overhead for that foundry is comparable to the overhead
> that would be experienced by a foundry the size of
> Guangdong's foundries and, if necessary based on this
> information, recalculate the surrogate foundry overhead
> component of constructed foreign market value.

Sigma II, at *1.

On remand, Commerce adjusted the values obtained in the 1991 cable to account for foundry size.  See Remand Results at 5. Commerce made the adjustments by relying on two facsimiles received from the United States embassy in Pakistan in 1997 during the course of its investigation.  See id. at 5-6.  In the first facsimile, dated November 19, 1997, the embassy conveyed that it had contacted "'possibly the largest Lahore-based foundry,'" but did not know whether this was the foundry referenced in the 1991 cable.  Id. at 5.  The embassy learned that the foundry has a production capability of 25,000 metric tons per month and overhead rates ranging from 15 to 20 percent.  See id.  The foundry estimated that small foundries, defined as ones capable of producing two to ten metric tons per month, would have overhead rates from 5 to 10 percent.  See Remand Results at 5.

The second facsimile, dated December 9, 1997, contained a letter from the Pakistan Steel Melters' Association that provided information about the sizes of foundries in Pakistan.  See id. at 6.  The letter clarified the 1991 cable by conveying that: (1) large foundries are capable of producing more than 500 metric tons per month; (2) medium foundries are capable of producing 100 to 500 metric tons per month; and (3) small foundries, or mini-foundries, produce up to 100 metric tons per month.  See id.

Commerce classified Guangdong's foundries by size, according to the information contained in the Steel Melters' Association letter. See id. at 6-7. Thus, depending on their production capabilities, three of the foundries were classified as medium and one as small. See Remand Results at 7. Based on the size of the foundries, Commerce calculated overhead rates as follows:

> Because the 1991 cable tells us that overhead rates for small foundries are 20-30 percent and that overhead rates for large foundries are 40-50 percent, we can reasonably infer that the medium-size factories would have an overhead range of between 30 and 40 percent. We based this inference on the fact that both the 1991 cable and the information submitted by the U.S. Embassy on November 19, 1997 reflect approximately the same proportion between the overhead rates for small foundries and those for large foundries. The 23.75 percent overhead rate used in the underlying review is based on the most specific information available to the Department. However, in light of the information discussed above, for these final results of redetermination, we have concluded that the 23.75 percent overhead rate calculated for the 1989-90 review period was taken from a large foundry and have assumed that this foundry represents the median of the large firms that the 1991 cable referenced as having overheads of 40-50 percent. In order to extrapolate what the overhead rate would be for a medium and a small foundry based on similarly specific information, we adjusted the 23.75 percent figure to reflect the size of Guangdong's foundries. For Guangdong's small foundry, we calculated overhead as (23.75%/45) X 25, i.e. 13.19 percent. For each of Guangdong's medium size foundries, we calculated overhead as (23.75%/45) X 35, i.e. 18.47 percent.

Id. at 7-8.

The domestic industry disputes Commerce's inference that overhead costs incurred by medium foundries are higher than those

incurred by small foundries and lower than those incurred by large
foundries, arguing that medium foundries could incur higher costs
than small foundries because they are family-run and higher costs
than large foundries because they can take advantage of economies
of scale.   See Domestic Industry's Comments on the Commerce
Department's Final Results of Redetermination Pursuant to Court
Remand ("Domestic Industry's Comments") at 2.   The domestic
industry, however, offers no evidence in support of these
contentions.  The domestic industry continues to maintain that the
overhead costs of the large Lahore foundry of 23.75 percent
constitute the best information available.  See id.

Guangdong, on the other hand, maintains that the overhead rate
is still not low enough. See Guangdong's Comments at 5.  Guangdong
protests that any comparison of its foundries to the Lahore-based
foundry is completely inappropriate given the difference in size
between them.  Guangdong's Comments at 11.  Guangdong believes that
"[w]hile the adjustments undertaken by Commerce ameliorated to some
degree the disparities, the adjustments did not create
comparability."  Id. at 11.  Guangdong complains that Commerce
ignored superior data on Indian overhead costs that Guangdong had
submitted.  See id. at 7.  Guangdong believes that Commerce also
could have used the overhead data in the Pakistan Steel Melters'
Association letter, from which Commerce had extracted the foundry

size data.  See id. at 9-10.  Commerce explained its rationale for

not using the new data by stating:

> We used values from the 1991 cable, rather than
> values obtained in the course of the remand, because the
> 1991 cable contained information contemporaneous with the
> period of review, and because the components of factory
> overhead for the "large Lahore based foundry" referenced
> in the 1991 cable are detailed, whereas none of the more
> recent information gathered from Pakistan for the remand
> provides such a breakdown for any size foundry.

Remand Results at 5.


The Court finds that Commerce's determination was supported by

substantial evidence.  The basic premise of Commerce's analysis

comes from the 1991 cable, which indicates that foundry size

affects overhead and that larger foundries incur greater overhead

costs than smaller foundries.  See Remand Results at 7.  Commerce

obtained new information during the course of its investigation and

utilized that information to adjust the overhead values of the

Guangdong foundries.  See id.  Specifically, Commerce reduced the

overhead figure derived in 1991 to account for the assumption that

the 1991 figure was derived from a large foundry, while the

Guangdong factories were smaller.  See id. at 7-8.  Such action was

permissible according to both the mandate of the CAFC and the

remand order by this Court.  See Sigma III, 117 F.3d at 1410; Sigma

II, at *1.

Although the Lahore and the Guangdong foundries are incongruous with respect to size, they are alike in other significant respects. For example, the 1991 data is contemporaneous with the period of review, and it is also specific to the iron castings industry. The components of the Lahore foundry overhead calculation, that is, depreciation of machinery, production overhead, refractories and molding costs, were known and could be compared to Guangdong's overhead components. These similarities between the Lahore and Guangdong foundries are necessary, since keeping as many factors constant between the Guangdong and Lahore foundries ensures that a fair comparison can be made even when the data is adjusted for size. As the government states, "[t]hese 'details', which make the overhead calculation specific to the type of casting operation that would produce iron construction castings . . . provide Commerce with assurance that the overhead value includes items closely associated with the castings process used by Guangdong's suppliers." Defendant's Comments at 8-9. Thus, once the Lahore data is adjusted for size, it is reasonable to assume that it is applicable to the Guangdong foundries.

Guangdong vehemently protests the use of the Pakistani data, believing that Commerce should have used the Indian data obtained during the course of the 1997 investigation instead. See

Guangdong's Comments at 16. The proper inquiry upon review of Commerce's determination, however, is whether the particular actions Commerce took were supported by substantial evidence, not whether Commerce could have used an alternative method or different information. Thus, "the question is whether the record adequately supports the decision of the ITA, not whether some other inference could reasonably have been drawn." Daewoo Elecs. Co. v. United States, 6 F.3d 1511, 1520 (Fed. Cir. 1993); see also Torrington Co. v. United States, 21 CIT ___,___, 965 F. Supp. 40, 42 (1997) ("It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record.") (citation omitted). "Nor does it mean that even as to matters not requiring expertise a court may displace [Commerce's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Because Commerce's determination was supported by substantial evidence, Commerce is affirmed.

## III. Antidumping Percentage

D&L and Guangdong maintain that Commerce incorrectly calculated the antidumping percentage, resulting in an overstatement of the margin. See D&L's Comments at 5; Guangdong's

Comments at 16.  Specifically, they claim that the entered value formula was incorrect because the denominator used in calculating the dumping percentage erroneously contained the value for foreign inland freight.  See D&L's Comments at 5-6; Guangdong's Comments at 17-18.

D&L and Guangdong had multiple opportunities to raise this argument before Commerce and before this Court and failed to do so. The government, therefore, claims that D&L and Guangdong should not be permitted to raise the issue at this late stage of the proceedings.  See Def.'s Comments at 13.  D&L and Guangdong admit that the error could have been found earlier.  See D&L Supply Company's and Guangdong Metals & Minerals Import & Export Corporation's Rebuttal to Defendant's Reply Comments Upon the Remand Results ("Rebuttal") at 14.

The issue before the Court, therefore, involves determining the proper juncture in the administrative and judicial process at which claims need to be raised in order to be decided on their merits.  The Court agrees with the government that D&L and Guangdong should not be permitted to raise this issue.  "It is well established that '[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the

reasons for its action.'"  Budd Co., Wheel & Brake Div. v. United States, 15 CIT 446, 452, 773 F. Supp. 1549, 1554 (1991) (quoting Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 155 (1946)); see AIMCOR v. United States, 141 F.3d 1098, 1111 (Fed. Cir. 1998) (Party was precluded from raising "issue *de novo* before the court when it failed to present the issue during the applicable comment period."); 28 U.S.C. § 2637(d) (1988) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.").  Because D&L and Guangdong could have brought this issue before Commerce during multiple earlier opportunities and failed to do so, the Court will not consider it on its merits.

## IV.  Packing Value

D&L and Guangdong protest Commerce's refusal to correct alleged errors in the packing expenses used to calculate each company's FMV. See Rebuttal at 15.  The parties claim that packing expenses are calculated as a percentage of the cost of manufacture ("COM") and that every time an input such as the cost of freight changes, the COM changes. See D&L's Comments at 10.  They argue, therefore, that the cost of packing should be automatically adjusted as are other percentages of prior costs. See id.  D&L and Guangdong also claim that because the packing value should change automatically, it was not necessary to raise this issue earlier.

See id.

D&L and Guangdong had brought this issue before Commerce after issuance of the Draft Remand Results.  Commerce responded that

> [b]ecause the packing adjustment is not directly affected by the recalculation of inland freight, because these respondents did not timely raise this issue before the Court, and because the Court has not included such a change in the remand order, in the interest of finality the Department has not made this change.

Remand Results at 20.  Commerce maintains that "the same constant values, rather than a percentage of COM, have been part of the programming with respect to the packing adjustment since the final results of the original reviews, for which programs were created in 1991."  Def.'s Comments at 14.  Commerce claims that because D&L and Guangdong failed to raise this argument in the original suit, before Commerce during the 1994 remand or in their comments to the Court following the 1994 remand, Commerce "continued to use the constant amounts, rather than the 'COM times 1.5 percent' formula, in the final results of remand."  Id. at 16.

The Court will not reach the merits of D&L and Guangdong's contentions.  D&L and Guangdong maintain that the packing expense should be calculated as a percentage of COM, while Commerce applied the packing figure as a constant value.  Thus, there is a fundamental dispute concerning the type of methodology Commerce should have used in calculating packing expenses and whether it

resulted in error.  Because the dispute centers on whether Commerce's method was erroneous, the Court cannot simply order that the expenses be recalculated.

The dispute concerning methodology is exactly the type of claim that D&L and Guangdong should have brought forth earlier in this case's long procedural history.  The Court is not persuaded by D&L and Guangdong's argument that "[i]t was only when the COM was reduced significantly as a result of the remands that the error became noticeable--as well as meaningful."  Rebuttal at 16. "Judicial economy, fairness to the parties and the need to fulfill Congress's intent of prompt resolution of these matters requires that errors of methodology, data selection, calculation, etc. all be raised at the outset, unless some extraordinary factor supports relief at a later date."  IPSCO, Inc. v. United States, 965 F.2d 1056, 1062 (Fed. Cir. 1992) (citation omitted).  There is no such extraordinary factor here.  Although ensuring the accuracy of final determinations is one countervailing factor,[5] here, it is greatly outweighed by considerations of fairness and finality, especially since D&L and Guangdong had several opportunities to discover and contest the alleged error.  To allow the parties to bring an overdue claim simply because they did not notice the allegedly

---

[5]    See Serampore Indus. Pvt. Ltd. v. United States, 12 CIT 825, 834, 696 F. Supp. 665, 673 (1988).

erroneous calculation provides no incentive for the parties to perform a diligent review of the record and to raise claims at the earliest reasonable opportunity.

Because the issue pertaining to packing expenses was not timely raised, the Court will not consider it on its merits. Commerce is affirmed.

### CONCLUSION

Commerce has abided by the Court's instructions on all matters, including that pertaining to the "all others" rate.  <u>See</u> <u>Sigma II</u>, at *1; <u>Remand Results</u> at 8.  Commerce's determination is affirmed in its entirety.  Because all other issues have been previously decided, this case is hereby dismissed.

                                    _____
                                    NICHOLAS TSOUCALAS
                                    SENIOR JUDGE


Dated:     February 10, 2000
           New York, New York